1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                        EASTERN DISTRICT OF CALIFORNIA

8

RICKY W. JAMES,                          CASE NO. 1:08-cv-00351-SKO PC
9
                    Plaintiff,            ORDER ASSESSING TERMINATING
10                                        SANCTIONS AGAINST PLAINTIFF,
       v.                                 DISMISSING ACTION WITH PREJUDICE,
11                                        AND DENYING MOTION IN LIMINE AS
J. WILBER, et al.,                        MOOT
12
                    Defendants.           (Docs. 109 and 121)
13
_____/
14

15              **Order Dismissing Action, with Prejudice**

16    **I.    Background**

17          Plaintiff Ricky W. James ("Plaintiff"), a state prisoner proceeding pro se and in forma

18    pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on March 12, 2008.  This action

19    for damages is proceeding on Plaintiff's Eighth Amendment claim against Defendant Saenz

20    ("Defendant") arising out of the denial of medical care at California State Prison-Corcoran ("CSP-

21    Corcoran") in June and July 2006.

22          On December 5, 2012, the Court granted Plaintiff's motion for the attendance of inmate

23    witnesses James Cardinel and Jimmy Reed at the jury trial set for January 15, 2013.  On December

24    21, 2012, Defendant filed a motion in limine seeking to exclude, in relevant part, the testimony of

25    Mr. Cardinel and Mr. Reed on the ground that they could not have been ear or eye witnesses to

26    relevant events.  Following the motions in limine hearing held on January 9, 2013, the Court vacated

27    the trial date and, relying upon its inherent authority, ordered Plaintiff to show cause why sanctions

28    ///

                                                    1

should not be imposed against him for making misrepresentations to the Court regarding his inmate witnesses.

Plaintiff filed a response on January 25, 2013, and Defendant filed a reply on February 11, 2013.  The Court held an evidentiary for May 29, 2013, at which Plaintiff, Mr. Cardinel, and Mr. Reed appeared and testified.

The Court now orders as follows with respect to the order to show cause why sanctions should not be imposed.

## II.    Inherent Authority to Impose Terminating Sanctions[1]

Federal courts have the inherent authority to sanction conduct abusive of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45, 111 S.Ct. 2123 (1991).  However, because of their very potency, inherent powers must be exercise with restraint and discretion.  *Chambers*, 501 U.S. at 44 (quotation marks omitted).  To be sanctionable under the Court's inherent power, the conduct must have constituted, or been tantamount to, bad faith.  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455 (1980); *Miller v. City of Los Angeles*, 661 F.3d 1024, 1036 (9th Cir. 2011); *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001); *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001).  Recklessness, when combined with an additional factor such as frivolousness, harassment, or an improper purpose, may support sanctions, *Vernon*, 255 F.3d at 1134; *Fink*, 239 F.3d at 994, but mere negligence or recklessness will not suffice, *In re Lehtinen*, 564 F.3d 1052, 1058 (9th Cir. 2009).  The extreme sanction of "dismissal is warranted where . . . a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch, Inc. v. Natural Beverages Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (citation omitted); *Leon v. IDX Systems, Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).

///

///

---

[1] In her reply, Defendant discusses Federal Rule of Civil Procedure 11 as a basis for sanctions.  However, in ordering Plaintiff to show cause why sanctions should not be imposed against him, the Court identified its inherent authority as the basis for sanctions and in light of Plaintiff's pro se status, it elects to constrain the basis for sanctions to that which was explicitly identified.  *See In re Lehtinen*, 564 F.3d 1052, 1060 (9th Cir. 2009) (citing *In re DeVille*, 361 F.3d 539, 548 (9th Cir. 2004)) (although the rule is not absolute, due process ordinarily requires notice of the misconduct at issue and the disciplinary authority under which the court is proceeding).

1    **III.    Discussion**

2        **A.    Factual Summary**

3            **1.    Complaint**[2]

4        The events at issue occurred on or about June 11, 2006, to July 17, 2006, during which time

5    Defendant allegedly refused to ensure that Plaintiff received dental care for his abscessed tooth.

6    (Doc. 1, Comp., ¶¶13-18; Doc. 139, Evid. Hrg. Tx., 24:16-19.)  In his complaint filed on March 12,

7    2008, Plaintiff alleged that when Defendant made her medication rounds in his building on June 11,

8    2006, he told her that he had an abscessed tooth which was causing him severe pain and preventing

9    him from eating, and that his dentures were broken and needed repair because he could not chew his

10   food.  Defendant refused to allow Plaintiff to go to the dental clinic because his face and jaw were

11   not swollen, but Defendant merely evaluated him "through a perforated steel cell door with multiple

12   obstructions of her view. . . ."  (Comp., 4:4-19.)

13           **2.    Second Scheduling Order**

14       On December 10, 2010, the Court granted Defendants Johnson, Wilbur, and Saenz's motion

15   for summary judgment.  Plaintiff filed an appeal, and on March 15, 2012, the Ninth Circuit affirmed

16   the decision with respect to Defendants Johnson and Wilbur, and reversed the decision with respect

17   to Defendant Saenz.  Following remand and an unsuccessful settlement conference, the case was

18   transferred to the undersigned on July 19, 2012, and the Court issued the second scheduling order

19   setting the matter for jury trial on July 20, 2012.

20       In the second scheduling order, Plaintiff was provided with detailed information regarding

21   the requirements for securing the attendance of incarcerated witnesses at trial.  Specifically, Plaintiff

22   was informed that incarcerated witnesses must be willing to attend and they must have actual

23   knowledge of relevant facts.  The order set forth how those requirements could be satisfied and

24   included the following directive: "Whether the declaration is made by the party or by the prospective

25   witness, it must be specific about the incident, when and where it occurred, who was present, and

26

27       [2] Plaintiff neglected to sign his complaint.  (Doc. 1.)  On June 18, 2013, pursuant to Federal Rule of Civil Procedure 11(a), the Court issued an order requiring Plaintiff to file a signed complaint within fifteen days and directing the Clerk's Office to provide Plaintiff with a copy of his complaint.  (Doc. 140.)  To date, Plaintiff has not complied with the order.

28

3

*how the prospective witness happened to be in a position to see or to hear what occurred at the time it occurred*." (Doc. 83, 2nd Sched. Order, 3:6-9 (emphasis added).)

### 3. Declarations

The deadline for Plaintiff to file a motion for the attendance of incarcerated witnesses was October 1, 2012. Between August 12, 2012, and August 14, 2012, less than one month after the second scheduling order was filed, Plaintiff drafted and signed four declarations seeking the attendance of four inmate witnesses. Two of the witnesses, Jimmy Reed and James Cardinel, also signed separate declarations dated August 13, 2012, and August 14, 2012, respectively. At that time, Plaintiff, Jimmy Reed, and James Cardinel were incarcerated at Kern Valley State Prison, where they remain currently.

Plaintiff filed his motion for the attendance of incarcerated witnesses, supported by the declarations, on September 14, 2012. In his own declarations, Plaintiff attested under penalty of perjury that all four inmates were eye and ear witnesses who possessed firsthand knowledge of relevant facts. Each declaration, however, differed with respect to the basis for firsthand knowledge.

Plaintiff attested that John Bengar told Plaintiff he was willing to testify voluntarily, and he was an eye and ear witness in that he could "d[e]scribe the practi[c]e of Defendants before, during and after the incident as well as the present practi[c]es [sic] of Defendants," and he had "firsthand knowledge of the entire incident. . . ." (Doc. 91, Pretrial Stmt./Motion, James Dec., p. 22.)

Plaintiff attested that David Reed told Plaintiff he was willing to testify voluntarily and he was an "ear witness to the neglect and a[n] eyewitness to policies and procedures that prove[] deliberate indifference of medical staff M. Saenz." (*Id.*, James Dec., p. 23.)

Plaintiff attested that James Cardinel was an eye and ear witness in that he lived in close proximity with Plaintiff on a daily basis, shared the same exercise period with Plaintiff, has firsthand knowledge of Plaintiff's condition, can discuss the relevant facts, and saw and heard Plaintiff request medical/dental attention. (*Id.*, James Dec., p. 18.) Mr. Cardinel attested that he is an "eye and ear witness to Defendants [sic] actions in Corcoran State Prison as well as the plaintiff's condition that led to this violation," and he "lived, exercised and communicated with plaintiff as well as Defendants [sic] duties and responsibilities which I witness M. Saenz neglect as well as other staff

on a daily basis as well as other staff on a daily basis as well as plaintiffs [sic] need for medical/dental services." (*Id.*, Cardinel Dec., p. 19.)

Finally, Plaintiff attested that Jimmy Reed was an eye and ear witness to Defendant Saenz's neglect and deliberate indifference, and Reed saw "plaintiff at yard informing M. Saenz of his need for medical/dental attention," and "heard Defendant M. Saenz in the housing unit refusing plaintiff medical/dental services." (*Id.*, James Dec., p. 20.) Mr. Reed attested that he saw Defendant Saenz refusing Plaintiff's pleas for medical and dental care over a period of thirty-seven days. (*Id.*, Reed Dec., p. 21.)

### 4.    **Telephonic Trial Confirmation Hearing**

The telephonic trial confirmation hearing ("TTCH") was held on December 5, 2012, and as an initial matter, the Court granted Plaintiff's motion for the attendance of James Cardinel and Jimmy Reed based on the sufficiency of the declarations. However, the Court proceeded to question Plaintiff about the knowledge possessed by John Bengar and David Reed:

> COURT: With respect to the first issue, that is plaintiff's motion for attendance of incarcerated witnesses at trial.  As I indicated, I have reviewed the defendant's opposition.  And the first basis for the opposition is that plaintiff has not complied with the requirements of the second scheduling order.
>
> I'll note that the intent of the scheduling conference order is to elicit sufficient facts from the plaintiff to allow the Court to determine whether the witness is willing to testify voluntarily and whether he has -- he or she has firsthand knowledge of relevant facts.
>
> With respect to inmates Cardinel and Reed, I find that the declarations are sufficient to demonstrate that these two witnesses were eye or ear witnesses to relevant facts. As such, plaintiff is entitled to their presence at trial.
>
> With respect to inmate John Bengar, plaintiff has attested that inmate Bengar can describe the events and has firsthand knowledge and can give testimony regarding defendants' practice before, during and after the incident and about defendants' current practice.
>
> Mr. James, my question for you is what did Mr. Bengar see or hear?
>
> MR. JAMES: Well, he heard it from me. He wasn't there personally.  So I wasn't sure on whether that was relevant or not. I'm willing to concede that Bengar's presence.
>
> THE COURT: I'm sorry. You said you're willing to concede what?
>
> MR. JAMES: Bengar's presence.

THE COURT: Okay. I'm not entirely sure what you mean by that, but Mr. Bengar – if the information you -- Mr. Bengar has is based on information you gave him, that would not make him an eye or ear witness to the incident.

MR. JAMES: Yes. That's what I --

THE COURT: He would testify as to hearsay conversation with you, which is not admissible, unless there's a hearsay exception. So at this time, if that is the only information Mr. Bengar has, I'm going to deny the request for the attendance of Mr. Bengar at trial.

Is there anything further in that regard?

MR. JAMES: No. No objections there.

THE COURT: Thank you. With respect to inmate David Reed, plaintiff has attested that inmate Reed is an ear witness to neglect and eye witness to policies and procedures which prove deliberate indifference.

Mr. James, my question again for you is what did Mr. Reed see or hear?

MR. JAMES: He didn't hear anything. It was the same thing that I was talking about Bengar. And I will not object to his removal or denial there.

THE COURT: Okay. Thank you very much. So Mr. Reed will also not be attending the trial.

(Doc. 125, TTCH tx., 4:5-6:7.)

Defendant's counsel, Mr. Douglas, objected to the attendance of witnesses James Cardinel and Jimmy Reed, and as a result, the Court questioned Plaintiff more specifically about what they saw or heard.

THE COURT: Let me ask you this, Mr. James.

MR. JAMES: Yes.

THE COURT: Based on what I have before me, it indicates that Mr. Cardinel and Mr. Reed were ear or eye witnesses to the relevant facts. In other words, that would mean that they either saw the incident and were present there or heard it by being there and maybe they weren't eye witnesses, but they had firsthand heard it. Is that correct? Or did they --

MR. JAMES: Yes. That is correct. They were there. They did hear it. If --

THE COURT: Okay.

MR. JAMES: It was on the yard and we had yard together.

THE COURT: Okay. **So they are eye witnesses to the incident and heard what happened.**

1   MR. JAMES: **Yes.**

2   THE COURT: Okay.  Thank you.  So my ruling with respect --

3   MR. DOUGLAS: Your Honor, may I be heard on that?

4   THE COURT: Yes, Mr. Douglas.

5   MR. DOUGLAS: Thank you.  He says that they were on the yard when the incident
6   occurred in the SHU unit, so I don't know what they could have possibly seen or
    heard.

7   THE COURT: The issue here is whether defendant Saenz disregarded Mr. James'
    request for dental care on June 11, 2006 and for 37 days thereafter.  Mr. James, what
8   is it that these two witnesses  heard in the yard or these two gentlemen heard in the
    yard that would relate to your issue of the disregard of defendant Saenz for your
9   request for dental care?

10  MR. JAMES: Well, **they was there.  They seen me.**  They seen my condition of my
    tooth and everything.  I was describing it to them.  And then when Saenz came by,
11  they seen -- seen me give a request and ask her for help and she never gave it to me.

12  MR. DOUGLAS: Well, Your Honor, in his complaint, under penalty of perjury, he
    says that that happened in the SHU unit.  And that's not on the yard.  If Mr. James is
13  saying they were next door and heard and saw it, that's one thing.  But he's saying this
    occurred in the yard.  She was not even out on the yard.  She was delivering
14  medication, which is not done on the yard, it's done -- in the SHU unit, it's done
    through direct observation therapy cell to cell.

15
    MR. JAMES: Excuse me.  The medication is passed out on the yard. We're placed
16  in cages. And they are passed out.  Each inmate has his cage.  **And these inmates are
    right across from me and they're right next to my cage.  They see and hear**
17  **everything.**

18  THE COURT: So let me make sure I understand.  Are you saying, Mr. James, and
    Mr. Bengar and -- I'm sorry, **Mr. Cardinel and Mr. Reed heard Mr. Saenz and**
19  **your conversation regarding the dental care issue**?

20  MR. JAMES: **Yes**.

21  THE COURT: Okay. Is there anything further in that regard?  I'm going to have to
    take Mr. James' word at it, Mr. Douglas.
22
    MR. DOUGLAS: I understand.
23
    THE COURT: He's saying that they heard --
24
    MR. DOUGLAS: Okay. I have just one thing. I mean, if they're going to testify as to
25  his condition, I would object.  **But if they're going to testify as to what they saw
    and heard defendant Saenz do, then I have no objection.  Is that what Mr.**
26  **James is saying these people will testify to?  What Saenz actually said and did?**

27  MR. JAMES: **Yes. That's what I'm saying.**

28  MR. DOUGLAS: And not your condition.

MR. JAMES: No.  They're not dentists.

MR. DOUGLAS: Okay.  Then I don't have any objection.

THE COURT: Okay.  Thank you very much. So with respect to the -- you have no objection, Mr. Douglas, to the issue of whether the witness' proposed testimony is cumulative because we're down to two witnesses. And it sounds like, from what we're hearing, both witnesses have direct knowledge of the information that's relevant to the issue in the case.

MR. DOUGLAS: Yeah, well, my objection -- I mean, I didn't -- I don't object to them on the grounds that they would be able to testify to relevant facts. But it does appear that they're cumulative.

THE COURT: Okay. With respect to that issue, district courts have broad discretion to limit the number of witnesses on a particular point to avoid cumulative evidence but must not sacrifice justice in the name of efficiency. **Plaintiff has indicated that he can show that the two witnesses he would like to have present at trial have actual knowledge of the relevant facts and their testimony will revolve around what they saw and heard between defendant Saenz and Mr. James. Now, Mr. James.**

MR. JAMES: **Yes, Your Honor.**

THE COURT: Did both of these witnesses -- and I'm talking about Mr. Cardinel and Reed, did they both hear this incident on the same date?

MR. JAMES: No.  It was on separate dates, but it was over like a 37-day period.

THE COURT: Okay.  **So they each heard your conversation with defendant Saenz regarding your request for dental care?**

MR. JAMES: **Yes.**

THE COURT: Okay.  Given that information, unless there's anything further, Mr. Douglas, the objection based on the witness' proposed testimony being cumulative is going to be overruled.

(TTCH tx., 6:21-10:19 (emphasis added).)

## 5.    Motion in Limine and Opposition

On December 21, 2012, Defendant filed a motion in limine seeking the exclusion of twelve separately enumerated categories or types of evidence, including, in relevant part, the exclusion of testimony by James Cardinel and Jimmy Reed.  (Doc. 109, Motion in Limine.)  In support of her motion, Defendant submitted evidence demonstrating that Mr. Cardinel could not have witnessed any events at Corcoran in 2006 because he was not housed at Corcoran in 2006, and that Mr. Reed could not have heard or seen any exchanges between Plaintiff and Defendant on the yard because

8

he and Plaintiff did not share yard time with Plaintiff between June 11, 2006, and July 17, 2006.[3]

The record of daily activity for Mr. Reed was filed under seal.  (Docs. 110, 111, 114.)

Plaintiff filed an opposition to the motion in limine on January 2, 2013, but he did not address the request to exclude the testimony of Mr. Cardinel and Mr. Reed.  (Doc. 115.)

### 6.   **Motions in Limine Hearing**

On January 9, 2013, the Court held a telephonic hearing on Defendant's motions in limine, during which Defendant's motion to exclude the testimony of Mr. Cardinel and Mr. Reed was addressed.  Plaintiff responded to the Court's inquiry as follows:

THE COURT: This is the date and time for the hearing on the motions in limine.

The Court has reviewed the defendant's motions in limine as well as plaintiff's opposition.  In one of the motions in limine, the defendant has moved to exclude the testimony of inmate witnesses James Cardinel and Jimmy Reed and to vacate their writs of habeas corpus on the grounds that those particular inmates could not have been ear or eye witnesses to relevant events.

In Mr. Wilber's [sic] opposition he addresses all of defendant's motions in limine except for the motion to exclude Mr. Reed and Mr. Cardinel's testimony and to vacate their transportation writs.

In seeking the attendance of Mr. Cardinel and Mr. Reed at trial, plaintiff submitted his own declaration and the witnesses' declarations, and in those declarations the witnesses attested that they were willing to testify voluntarily on Mr. Wilber's behalf.

And if the parties will recall, at the December 5th, 2012 telephonic trial confirmation hearing, the Court questioned Mr. Wilber [sic] regarding what Mr. Cardinel and Mr. Reed saw or heard, and based on the declarations submitted, and Mr. Wilber's additional representations during the hearing, the Court found that Mr. Cardinel and Reed saw and heard plaintiff ask Defendant Saenz for medical care, and that Defendant Saenz responses as well, and the Court granted plaintiff's motion for their attendance at trial.

Now, as I indicated earlier in support -- I'm sorry, I shouldn't -- as I indicated earlier, the defendants are moving to exclude the testimony of both witnesses, and in support of their motion in limine to exclude the testimony of Mr. Cardinel, the defense has submitted evidence that it -- Mr. Cardinel was not incarcerated at California State Prison Corcoran in 2006.

With respect to Mr. Reed, Mr. Wilber [sic] had represented during the hearing that Mr. Reed was in a nearby exercise cage during the yard time and he saw and heard

---

[3] Mr. Cardinel's bed assignment sheet establishes that he left Corcoran for California Correctional Institution on June 24, 2004, and he arrived at Wasco State Prison on November 12, 2008.  (Motion, p. 13.)  Mr. Cardinel testified at the evidentiary hearing that he released from custody at the end of 2004 and he remained out of custody for all of 2005.  (Evid. Hrg. Tx. 113:14-117:4.)  Mr. Cardinel was arrested on June 6, 2006, and incarcerated at the Riverside County Jail until the end of 2008, approximately.  (*Id.*)

1   an interaction between Mr. Wilber [sic] and the defendant regarding medical care.
2   However, the defendant has submitted evidence that Mr. Reed did not share yard time with the plaintiff during the relevant time period in 2006.

3   Mr. Wilber, [sic] you have not responded to the defendant's motion in limine to
4   exclude Mr. Reed and Mr. Cardinel's testimony.   What is your response to that motion?

5   MR. JAMES: Are you talking to me?

6   THE COURT: Yes. Mr. James, I'm sorry.

7   MR. JAMES: Yeah. I'm just going by memory, it's like six and a half years ago, and
8   I questioned Mr. Cardinel right after our December 5th meeting, and we determined that he was not there, so I cannot object to that.

9   And Mr. Reed, I haven't the resources that the Attorney General has, and I can't
10  dispute his logs.  If his log says he wasn't there, I know I was there with him for eight years, and I took his word for it that we was on the cage and he was out there that
11  day.  But apparently I am mistaken, so I cannot object to excluding that testimony and taking him off the list there.

12  THE COURT: Okay.  Let me back up just a minute.  I did refer to Mr. Wilber, and
13  my references to Mr. Wilber were not correct, I meant Mr. James, and the references to the plaintiff and Mr. James were what they were.

14  I'm sorry, let's back up, Mr. James.

15  MR. JAMES: Okay.

16  THE COURT: With respect to Mr. Cardinel your previous -- the declaration indicates
17  that he was an eye and -- or ear witness to the incident.  What is your position today?

18  MR. JAMES: Yes. I spoke to him after December 5th, after we had -- I excluded the other two, and I -- we determined then that he was not there, and --

19  THE COURT: And did you notify the Court of that matter and --

20  MR. JAMES: I was going to, but I figured I'd just do it today and --

21  THE COURT: Okay. You know -- hold on, Mr. James.

22  MR. JAMES: Okay.

23  THE COURT: The response to the motion in limine, in the motion in limine the
24  defense made it very clear that Mr. Cardinel was not there.

25  MR. JAMES: Yes.

26  THE COURT: You indicate in addition that you spoke with Mr. Cardinel after the December 5th hearing, presumably before you got the motion in limine from the
27  defense, and you knew that he wasn't there, and yet there is nothing in your papers that indicates that Mr. Cardinel was not there.

28  MR. JAMES: I -- because I was going to do it during this meeting here. I work -- I'm

10

not a lawyer. I don't -- I didn't know I had to. That's why I didn't object to it is because I -- today I was going to exclude him.

THE COURT: But let me ask you this: we have a declaration before the Court indicating Mr. Cardinel's knowledge of the events that are at issue in this case. What is your position with respect to that declaration?

MR. JAMES: I don't understand what you're saying.

THE COURT: What I'm asking you is who prepared the declaration of Mr. Cardinel?

MR. JAMES: I did.

THE COURT: You prepared the declaration?

MR. JAMES: Yeah, based on what he had told me.

THE COURT: And who signed that declaration?

MR. JAMES: I did, although -- did he sign it?

THE COURT: No, what I asked is who signed the declaration?

MR. JAMES: I don't -- I don't get what you're saying?

THE COURT: Who signed the declaration of Mr. Cardinel?

MR. JAMES: I don't think he signed it, no. I don't think -- I didn't sign his name. Hello?

THE COURT: Mr. James --

MR. JAMES: Yes?

THE COURT: -- we have your declaration, which we understand you signed. And there's also Mr. Cardinel's declaration, which is signed. So my question for you is who signed Mr. Cardinel's declaration?

MR. JAMES: I guess that would have to be Mr. Cardinel.

THE COURT: Okay. Let's go on now to Mr. Reed. I'm sorry, what is your position with respect to the defense's motion in limine that Mr. Reed was not present in the yard and could not have observed the events that are at issue in this case?

MR. JAMES: Yeah. We believed he was. I did, and he did, and it was over a period of eight years that he was there with me, and -- but I can't argue with the log numbers there. I can't argue with that. I can't -- if that's -- if the logs say that, I cannot argue that he was there. I was sure he was.

THE COURT: Okay. Let me --

MR. JAMES: But I have no objection to excluding him, no.

THE COURT: Let me ask you this: who signed Mr. Reed's declaration?

MR. JAMES: Mr. Reed did.

THE COURT: Okay.  So Mr. Reed signed his declaration and Mr. Cardinel also signed his declaration that was submitted to the Court?

MR. JAMES: Yes.

(Doc. 124, Motions in Limine Hrg., 2:13-7:25.)

The Court informed Plaintiff during the hearing that it was going to issue a written order to show cause why sanctions should not be imposed for making misrepresentations to the Court and on January 9, 2013, the Court issued the order, which (1) placed Plaintiff on notice that the Court was considering the imposition of sanctions under its inherent authority for making misrepresentations regarding his trial witnesses and (2) provided Plaintiff with the opportunity to be heard.  *In re Lehtinen*, 564 F.3d at 1060-61.  The parties were informed that the Court would set an evidentiary hearing if it deemed one to be necessary following review of the parties' written responses to the order.

### 7.    Response to Order to Show Cause

In his written response to the order to show cause, Plaintiff argued that as a pro se litigant unfamiliar with the proceedings, he should not be held to "strict protocols."  (Doc. 126, Resp. to OSC, p. 1.)  Plaintiff attested under penalty of perjury that he had believed that eye and ear witnesses included people to whom Plaintiff had relayed events via correspondence, at the time the events occurred.  (*Id.*)  Plaintiff attested that when it was made clear at the TTCH on December 5, 2012, that eye and ear witnesses were only those whom were actually present and heard or saw Plaintiff and Defendant at the time of their interactions during the thirty-seven day period at issue, he immediately and in good faith withdrew his request for the attendance of inmates Bengar and David Reed.  (*Id.*, pp. 1-2.)

Plaintiff attested, however, that before he could dismiss Cardinel or Jimmy Reed, he needed to interview them.  (*Id.*, p. 2.)  Plaintiff attested that Mr. Reed was with him at CSP-Corcoran during his eight-year stay there, and that Mr. Cardinel was in his section.  While he was unsure of the year, Mr. Cardinel could have witnessed it.  (*Id.*, p. 2.)  Plaintiff attested that after interviewing his witnesses, Mr. Cardinel had to be released but a determination regarding Mr. Reed could not be

made without a review of the security logs, to which Plaintiff did not have access or an opportunity to examine. (*Id.*) Plaintiff then attested that upon review of the security logs, an "honest mistake" was discovered. While unwilling to concede to the document's accuracy or validity, Plaintiff "nevertheless in good faith" released Mr. Reed, his final witness. (*Id.*) Plaintiff attested that Mr. Reed had no reason to mislead the Court or sign knowingly sign an untrue affidavit, and no specific intent otherwise can be shown. (*Id.*, p. 3.) Plaintiff contended that because no testimony was given and in light of the diligent correction of the mistake, the error was harmless. (*Id.*)

Plaintiff also attested that he has many eye and ear witnesses but he chose not to call active gang members, in the interest of justice and for safety reasons. Plaintiff contended that sanctions are not warranted for a mistaken statement. (*Id.*)

Plaintiff attested that during the TTCH on December 5, 2012, he stated what he believed to be true at the time and he voluntarily took steps to correct the discrepancies once he became aware of them. (*Id.*, p. 4.) Plaintiff only dismissed two witnesses at that time because those were the two he was certain were unqualified and he did not want to release his other two witnesses without first speaking with them, and he had no reason to believe what he was told was untrue. (*Id.*) Plaintiff stated that he demonstrated good faith by withdrawing his request for his witnesses at the first sign of doubt. (*Id.*, p. 5.) Plaintiff also stated that he did not receive Defendant's motion in limine until December 27, 2012, leaving him with only six days to prepare and file his opposition; and he did not have time to interview his witnesses. (*Id.*)

### 8.   Evidentiary Hearing

#### a.   Plaintiff's Testimony

Following receipt and review of the parties' responses to the order to show cause, the Court set an evidentiary hearing for May 29, 2013; Plaintiff, Mr. Cardinel, and Mr. Jimmy Reed appeared in person, along with Defendant's counsel, Mr. Douglas. It was established that the relevant time period with respect to Plaintiff's Eighth Amendment dental care claim against Defendant occurred between June 11, 2006, and July 17, 2006, approximately. (Doc. 139, Evid. Hrg. Tx., 20:1-13.)

Plaintiff testified that prior to the TTCH held on December 5, 2012, he believed ear witnesses included those he told about the incident, and during the TTCH, the Court made him aware that only

those who were present at the time to see and hear the incident between Plaintiff and Defendant qualified as ear or eye witnesses. (*Id.*, 12:2-13:25; 22:22-23:3; 23:1424:2; 27:12-25; 33:5-10.) However, Plaintiff testified that he understood what eye witnesses were. (*Id.*, 28:1-9; 33:5-10; 35:24-36:8.)

Plaintiff testified that he dismissed witnesses John Bengar and David Reed after the Court explained to him that they could not have been ear or eye witnesses as he had only corresponded with them. (*Id.*, 23:14-24:8; 28:17-22.) When questioned regarding where in the TTCH transcript the Court so informed Plaintiff, he testified that before the hearing he intended to withdraw Bengar and David Reed as witnesses because he had come across knowledge, which he believed came from the Court. (*Id.*, 24:22-25:22.) Plaintiff subsequently testified that he could not say where he came across the knowledge but he believed it came from the Court. (*Id.*, 30:10-18.)

When questioned about the contents of the declarations and his belief the contents were true, Plaintiff testified he was copying from another form by hand and he may have put in a word here and there that did not belong but he did not think it was a big issue. (*Id.*, 35:11-36: 58:22-25; 105:4.) Plaintiff also testified that he was copying one form from another and he just copied what the form said and signed under penalty of perjury because otherwise the Court would not accept it. (*Id.*, 37:10-12 & 40:5-8; 106:17-19.)

Plaintiff subsequently testified that at the TTCH, he was contemplating dismissing James Cardinel and Jimmy Reed as witnesses. (*Id.*, 56:9-21; 58:2-14.) Although he believed they were present and saw what happened, he was unsure. (*Id.*, 58:15-22.) Plaintiff testified that when Cardinel and Reed gave him their statements, they said they were there and he filled out the forms (declarations). (*Id.*, 58:22-25.) Plaintiff wanted to talk to them because he did not want to dismiss them if they were actually there and saw something. (*Id.*, 59:2-4.) Plaintiff testified that he believed Jimmy Reed was there. (*Id.*, 59:4.) Plaintiff subsequently testified that from what Mr. Cardinel and Mr. Reed told him, they were there, but he had not really gone over the case with them. (*Id.*, 59:15-22.)

Plaintiff initially testified that he talked to Mr. Cardinel within a few weeks after the TTCH, and he subsequently testified that he talked to Mr. Cardinel and Mr. Reed three or four days after the

1   TTCH.  (*Id.*, 61:16-23; 77:11-20; 78:17-22; 79:1-4).  Plaintiff saw Mr. Cardinel when he was at

2   work and approached him to ask if he was there in Plaintiff's section during 2006  (*Id.*, 77:21-23;

3   79:5-7.)  Mr. Cardinel said he was not.  (*Id.*, 79:7.)  Plaintiff testified that he had previously asked

4   Mr. Cardinel if he remembered Plaintiff having his teeth pulled, being unable to get to the dentist,

5   and Defendant Saenz, and Mr. Cardinel said yes.  (*Id.*, 79:12-16.)  Plaintiff then asked him if he

6   would volunteer to be a witness and Mr. Cardinel said yes.  (*Id.*, 79:19-21.)  In securing Mr.

7   Cardinel's declaration in August 2012, Plaintiff never asked him if he was there in 2006.  (*Id.*, 79:8-

8   14; 80:5-10; 81:10-19.)

9        With respect to Jimmy Reed, Plaintiff testified that after the TTCH held on December 5,

10   2012, he asked Mr. Reed if he was there, if he remembered Plaintiff's issue, if he remembered

11   Defendant coming by and giving Plaintiff his medication, and if he remembered Defendant would

12   not let Plaintiff see the dentist, and Mr. Reed said yes.  (*Id.*, 82:1-8.)  Plaintiff testified that he told

13   Mr. Reed the yard schedule (record of daily activity) indicated he was not there, and Mr. Reed said

14   he believed he was there and saw it.  (*Id.*, 82:8-11.)  Plaintiff testified that the yard schedule he

15   showed Mr. Reed within a few days of the hearing was the one Defendant's counsel sent him  (*Id.*,

16   82:22-83:9.)  However, when questioned about the fact that he could not have showed Mr. Reed the

17   yard schedule because he did not receive the motion in limine, to which the yard schedule was an

18   exhibit, until December 27, 2012, Plaintiff testified that he was mistaken and conceded he did not

19   have the yard schedule when he met with Mr. Reed.  (*Id.*, 84:8-25; 85:19-86:9.)  Plaintiff then

20   testified that he did show Mr. Reed the yard schedule but it must have been at a different time, after

21   he received the motion in limine.  (*Id.*, 86:14-21.)  When questioned about his statement in his

22   opposition to the motion in limine, made under penalty of perjury, that he did not have time to

23   interview his witnesses, Plaintiff testified that he did not remember the exact dates but he

24   interviewed them after the TTCH and after receiving Defendant's motion in limine.  (*Id.*, 87:8-

25   88:11.)

26        When Plaintiff was questioned about showing Mr. Reed the yard schedule when Mr. Reed's

27   yard schedule was filed under seal, Plaintiff maintained that he received both yard schedules from

28   ///

Defendant's counsel, he had given it to Mr. Reed, and he had it back at his house (cell). (*Id.*, 88:12-18-95:25.)

Plaintiff subsequently testified that both he and Mr. Reed believe they were on the yard during the thirty-seven day period in June and July 2006 when Defendant came to give Plaintiff his medication, and Plaintiff gave her a request form and she left. (*Id.*, 99:3-22.) Plaintiff testified that Mr. Reed was in a cage "a little ways away" from Plaintiff and he could not have heard what Defendant said, but after she left, Plaintiff yelled to him that she would not let Plaintiff go to the dentist. (*Id.*, 100:10-18.)

### b.    Testimony of James Cardinel

MR. DOUGLAS: Mr. Cardinel, at some point in the past, Mr. James approached you to sign a declaration.  Is that true?

MR. CARDINEL: Yes.

MR. DOUGLAS: When did he approach you?

MR. CARDINEL: I'm not sure if I signed it in the THU or after we were on the lower yard.  I'm not sure of the exact month.

MR. DOUGLAS: What's the THU?

MR. CARDINEL: A drop-off program that -- for gang members.  We all completed.

MR. DOUGLAS: Did you complete that program together?

MR. CARDINEL: Yeah.  Well, all of us had been active gang members in the 2000s or whatever, dropped out, and, yeah, our timing was that we had went through the THU together.

MR. DOUGLAS: And the gang you dropped out was the Nazi Low Riders?

MR. CARDINEL: Yes.

MR. DOUGLAS: Did you know each other when you were all in the Nazi Low Riders?

MR. CARDINEL: Yes.  We were active.  We were all friends.

MR. DOUGLAS: And you're -- when did you -- when were you in the THU?

MR. CARDINEL: September 2000 -- year and a half -- I've been out only for a year and a half.  September 2011 I want say that I came out.  That would -- that would make sense.  September 22nd, 2011, I came out to -- to D2.

THE COURT: And when did you go into the program?

1    MR. CARDINEL: 2010, September 13th.

2    THE COURT: Did you --

3    MR. CARDINEL: We sign an affidavit I believe -- it would have to be within the last year because he came out. We did -- I remember we signed it by the restroom right there on the yard.

4

5    THE COURT: When did you first meet Mr. James.

6    MR. CARDINEL: 1999.

7    THE COURT: All right. Thank you. Please proceed.

8    MR. DOUGLAS: Okay. You just testified that you were unsure whether he approached you regarding the declaration while you were in THU. Was that your testimony?

9

10   MR. CARDINEL: I was unsure when I signed the declaration.

11   MR. DOUGLAS: You might have signed it when you were in THU?

12   MR. CARDINEL: No. I know I signed it now, but -- because we had had conversations about this case when we were in the THU.

13

14   MR. DOUGLAS: What conversations did you have?

15   MR. CARDINEL: We both worked together in the kitchen -- well, about the fact of me knowing about his case, right? And I told him that I did know all about his case.

16   MR. DOUGLAS: How did you know about his case?

17   THE COURT: I'm sorry. I thought you said you did not know about his case or you did know about his case.

18

19   MR. CARDINEL: That I did know about his case.

20   THE COURT: Okay.

21   MR. CARDINEL: Could you repeat the question.

22   MR. DOUGLAS: Well, let's get back to the declaration.

23   MR. CARDINEL: All right.

24   MR. DOUGLAS: Do you recall now when you signed it?

25   MR. CARDINEL: Yeah. I signed it where you use the restroom on the yard, on the lower yard.

26   MR. DOUGLAS: When was that?

27   MR. CARDINEL: I don't know what month it was. It has to be within the last year. I mean I don't have the declaration on me or would tell you the date. I'm in ad-seg now, so I don't have any of the paperwork that you or James sent to me or -- that I

28

17

1    received from you guys through legal mail or whatever.

2    MR. DOUGLAS: Did you prepare the declaration?

3    MR. CARDINEL: No, I did not.

4    MR. DOUGLAS: Was the declaration prepared already when you signed it?

5    MR. CARDINEL: Yes, it was.

6    MR. DOUGLAS: Did you tell Mr. James what to put in the declaration?

7    MR. CARDINEL: No, I did not.

8                                             ***

     MR. DOUGLAS: And after -- how long were you looking at the document that you
9    signed -- that Mr. James asked you to sign?  How long did you read it?

10   MR. CARDINEL: I breezed through it.  It was on the yard.  Maybe 30 seconds.  I
     didn't even read the whole document. He had asked me -- he had asked me if I knew
11   about his case.  I had told him that I did know about his case. At the time, I had heard
     of his case through letters and stuff.  I actually thought I was in Corcoran with him.
12   I didn't know that in 2006 is when his case happened. We were having a lot of
     medical issues right there in Corcoran.  So -- but I very briefly -- this is something
13   that's important for James.  It's of very little importance to me, so –

14   MR. DOUGLAS: And did James interview you after you signed your declaration
     sometime in 2012?
15
     MR. CARDINEL: Interview me?
16
     MR. DOUGLAS: Yes.
17
     MR. CARDINEL: I think he had asked me -- had a sheet full of questions and asked
18   me -- had asked me some questions.

19   MR. DOUGLAS: When was that?

20   MR. CARDINEL: I don't know the date. I don't have any paperwork in front of me
     and it's – and the other dates that have to do with me are important to me because I
21   caught 27 years on 2006. So it's easy for me to remember dates like that.  But as far
     as for James's case, if you're asking me to recall anything that's pertinent to his case,
22   I don't know any dates.  I don't even know what the date is today, so -- I'm sitting
     in ad-seg and you guys came and told me I had court at 4:30 this morning.  So I got
23   ready.

24   MR. DOUGLAS: Are you on the same yard as Mr. James?

25   MR. CARDINEL: Right now?

26   MR. DOUGLAS: Yes.

27   MR. CARDINEL: No.

28   MR. DOUGLAS: Were you on the same yard as Mr. James in December 2012?

MR. CARDINEL: Yes, I was.

MR. DOUGLAS: Do you recall being interviewed by James in December 2012?

MR. CARDINEL: Yes. I've talked to James on a few occasions about his case.

MR. DOUGLAS: What did he -- did he approach you, or did you approach him?

MR. CARDINEL: Initially he just told me that he had a lawsuit regarding some medical stuff in Corcoran and I told him that I remembered when all that stuff happened.  And --

THE COURT: Hold on.  How did you remember that if you were in Ventura County Jail at the time?

MR. CARDINEL: Well, we all belonged to a gang together and we all kept in contact through third-party mail and through legal mail, so --

THE COURT: Did Mr. James know that you were in Ventura County Jail from June 6, 2006, until November 2008?

MR. CARDINEL: No.  I told him that I was in Corcoran, but we never discussed the date.  I just knew about an incident that he had.  We had numerous -- with our gang, we had numerous medical problems on this yard where one of our gang members even stabbed a doctor on the yard. So if you're -- for me to remember that we're having medical issues and stuff, you know, that -- yeah, we had a lot of them. You know, Ricky Black stabbed a -- a doctor right there.  You know, I had actually thought that this issue was in 2004. I didn't know that it was in 2006.  When you're bringing me –

THE COURT: Who told you the issue was in 2004?

MR. CARDINEL: I thought that the issue was in 2004 because all the issues that we were having at that time.

THE COURT: Okay.

MR. CARDINEL: And when I spoke to the Attorney General right here on the phone, I told him I had no pertinent information to this case to discuss.  Everything that I had was secondhand information and therefore it's -- it's not pertinent.  It's stuff that I had heard from homies of ours. It's stuff that we had talked about in letters.  And for me to get confused on where I was on a certain year besides 2006 because I caught 27 years that year is easy, so --

THE COURT: Did you tell Mr. James that you didn't have any specific information?

MR. CARDINEL: After I found out it was in 2006, which was -- he had already put me on the list to be right here.  I had already signed an affidavit and everything.

THE COURT: You have questions about the affidavit, Mr. Douglas?

MR. DOUGLAS: No.  I think he said enough, Your Honor.

MR. JAMES: Could I ask a question?

THE COURT: You may, but I do have some questions. You indicated that you are willing to testify without being subpoenaed and you have actual firsthand knowledge of relevant facts of a defendant's practices and that you were an eye and earwitness to defendant's actions in Corcoran State.

MR. CARDINEL: I took it I was either an eye or earwitness and at that time -- I'm not attorney.

THE COURT: This says here eye and earwitness.

MR. CARDINEL: Well, that's the way I took it. I'm not an attorney. I'm not a judge. I don't have any of these qualifications. I got a GED. I had secondhand information. That's all I ever had. You guys want to beat it to death, you can, but --

THE COURT: Did you have specific information regarding Nurse Saenz [sic] interactions with Mr. James?

MR. CARDINEL: No. I do not have specific information other than I had heard about what happened with him.

THE COURT: And who did you hear that through?

MR. CARDINEL: I had heard that from Rick Sticky (phonetic), James Mickey (phonetic), and Rick James of what was going on in the medical to do with first his cancer and his mouth with his -- with his -- with his teeth and with his mouth and the eating and all the -- a couple of different things that were going on with him.

THE COURT: So the information you got was through Mr. James and other inmates.

MR. CARDINEL: Yes.

MR. DOUGLAS: I have no further questions.

THE COURT: Thank you. Mr. James, do you have any questions of this witness?

MR. JAMES: Yes.

MR. JAMES: Do you recognize this document?

THE COURT: I'm sorry. You're -- we're going to need to obtain that document from you, Mr. James, to show it to the witness.

MR. JAMES: All right.

THE COURT: Are you referring to the document that we've marked as Defendant's Exhibit 15?

MR. JAMES: Yes. Well, I didn't want to say anything, but I -- I'll ask him a question.

THE COURT: No. We can provide him a copy of the document if you wish that we do so.

MR. JAMES: No. It'd be okay.

THE COURT: Okay. Please proceed.

MR. JAMES: Did I give you a yard schedule and -- not a yard schedule, not you, but did I give you any -- a printout from every prison you've ever been in, and all the time you served in CDC?

MR. CARDINEL: Yes, you did.

MR. JAMES: All right. Now, where'd I tell you I got that document?

MR. CARDINEL: From the attorney general.

MR. JAMES: All right. Thank you. I have no more questions.

THE COURT: Okay. Thank you very much. Any further questions of this witness?

MR. DOUGLAS: No, Your Honor.

THE COURT: Thank you very much.

MR. CARDINEL: All right. Thank you.

THE COURT: Thank you, Mr. Cardinel. I do actually -- hold on. Before Mr. Cardinel is excused. Mr. Cardinel, why did you sign the declaration? And if you would like, we're happy to give you a copy of the declaration and maybe we can put it on the overhead projector, Mr. Douglas.

MR. DOUGLAS: Let the record reflect that I'm showing Exhibit 4, ECF Document 91, page 19, declaration of James Cardinel.

THE COURT: Your declaration, Mr. Cardinel, indicates that you have actual firsthand knowledge of the relevant facts.

MR. CARDINEL: I understand that, but at the time of signing this, it was actually James that explained to me that I didn't have firsthand knowledge.

THE COURT: He told you you did not have firsthand knowledge?

MR. CARDINEL: When I explained to him that I had heard through letters, he told -- because he told me how can – how can you have firsthand knowledge about this when you weren't even there in 2006.

THE COURT: So he knew you weren't in Corcoran in 2006.

MR. CARDINEL: Once -- when he handed me the document saying that I was not there in 2006, I told him, well, I thought this stuff happened in 2004 and that with me having information about it, you know, then that's firsthand and he explained to me that firsthand knowledge would be if I seen myself, or I heard myself from the person, or whoever is -- the individuals involved, then I would have firsthand knowledge. Hearing from somebody else is secondhand knowledge.

THE COURT: Okay. And when did he give you this information about firsthand knowledge?

MR. CARDINEL: When he gave -- gave me a copy of the -- where I had been -- the prisons that I had been. When he notified -- I didn't even know it wasn't in -- it was in 2006 until he gave me a copy of where I was at. He was very disgruntled with me that I was somewhere else in 2006. We had a little conversation about it and he handed me -- I still have the stuff in my cell. I have it right now, but -- that I wasn't there and then when I explained to him what I knew as far as how I went about hearing it, and he explained to me this isn't firsthand knowledge, you know.

THE COURT: Do you recall approximately when this was? Was it before Christmas, after Christmas of last year?

MR. CARDINEL: It was before I talked to the attorney general on the phone. So -- I'm not sure exactly when it was.

THE COURT: Let's focus on this particular declaration that you signed on August 13th, 2012. You indicate you're willing to testify without being subpoenaed, that you have actual firsthand knowledge of the relevant facts of defendant's practice and was there as an eye and earwitness to defendant's actions in Corcoran State Prison.

MR. CARDINEL: But you see that there's -- even on this affidavit that I signed that it doesn't say that I was there in 2006 and I'm still -- this -- our conversation was after this affidavit was signed. I thought that I was -- I did -- thought I had firsthand knowledge -- to my understanding. And I understand that now that I didn't, you know, and I -- I explained that to the attorney general on the phone when he called me, that I was not there, I did not have firsthand information.

THE COURT: Okay.

MR. CARDINEL: So that's why it's just -- for me to even be here right now, I just don't even see the sense of it because I notified you guys prior that I don't have firsthand knowledge. Yes, I signed the affidavit, you know. You guys want to give me some time for it?

THE COURT: Mr. Cardinel, the purpose of these proceedings is not to give you time for the affidavit. We're trying to find out what happened and what the circumstances were --

MR. CARDINEL: I didn't have an --

THE COURT: Hold on. You've got to wait until I finish asking my question --

MR. CARDINEL: All right.

THE COURT: -- before you answer. You may not interrupt me. The question for you was what did you know when you signed this affidavit and who gave you that information.

MR. CARDINEL: The information was through letters.

THE COURT: By whom?

MR. CARDINEL: Rick Sticky, James Mickey, and Rick James.

THE COURT: And what information was provided to you through letters?

MR. CARDINEL: About the problems that he was having with his cancer and his dental.

THE COURT: And this is Mr. James.

MR. CARDINEL: This is Mr. James.

THE COURT: Okay. And when was your understanding that he was having these problems?

MR. CARDINEL: In 2004.

THE COURT: Okay. And who told you that he was having these problems in 2004?

THE WITNESS: Rick Sticky was the first person who told me.

THE COURT: Did Mr. James tell you that he was having these problems in 2004?

MR. CARDINEL: I couldn't honestly tell you if I had gotten a letter directly from him. All my mail was three-way mail, a lot of information that -- this was small stuff. It was just little, like a P.S., what was going on with him.

THE COURT: Okay.

MR. CARDINEL: We were talking about having people whacked and stuff like that. That was more important. This is -- he was having problems with his testicles and his mouth.

THE COURT: Okay. What I'm trying to get at is did you believe that when you were preparing this --

MR. CARDINEL: I believe that I --

THE COURT: Hold on. Again you may not interrupt me.

MR. CARDINEL: Okay.

THE COURT: Did you -- was your understanding when you prepared this declaration that the incident that Mr. James was referring to happened in 2004 when you were in Corcoran State Prison?

MR. CARDINEL: Yes, it was. It was my understanding.

THE COURT: And you signed this document on 8/13/2012?

MR. CARDINEL: Yes.

THE COURT: It's on the overhead projector.

MR. CARDINEL: Yes.

THE COURT: Okay. And you said sometime after you signed this document that you met with Mr. James?

MR. CARDINEL: Yes. 2009.

23

THE COURT: That would be before.

MR. CARDINEL: Before this.

THE COURT: Okay.  So you met him in 2009?

MR. CARDINEL: No. I -- I mean him in 1999 is when we met.  I was with him in -- from 2009 till now, me and James have been around each other, able to talk.  Maybe a few months in between that we couldn't speak when I was at the THU.  Then he came down to the lower yard. I'm in ad-seg now.  Of course, we can't speak.  He's on D yard.  I'm on B yard.  So --

THE COURT: And he's a good friend of yours.

MR. CARDINEL: I've known him for a very long time.

THE COURT: Okay.

MR. CARDINEL: I consider him a good friend, yes.

THE COURT: And he came to you sometime around August 13, 2012, and asked you to sign a declaration.

MR. CARDINEL: Yes, he did.

THE COURT: And when you signed this declaration, was it your understanding that the incidents to which he was referring happened in 2004 when you were in Corcoran?

MR. CARDINEL: Yes, it was.

THE COURT: Because that would have been when you were in Corcoran.

MR. CARDINEL: Yes, it was.  It was my understanding that it was a whole different time.  My -- I was the one confused on it and like I said, the date's not on the declaration.  I mean, I didn't -- I didn't know that I had the -- the times wrong until he confronted me on it and about the firsthand information till he confronted me on it.

THE COURT: And what do you mean when you say he confronted you on it?

MR. CARDINEL: Well, he brought me a piece of paper saying that how could I have firsthand information about it being that I wasn't there.

THE COURT: And what was your response?

MR. CARDINEL: That I thought that I was there.  I didn't know it was 2006.

THE COURT: And did he explain to you that it was in 2006?

MR. CARDINEL: He explained to me that it was in 2006 and he also explained to me that if I had gotten -- I'll issue a letter from somebody else that was there, then that wasn't firsthand information. And then sometime after, the attorney general called me and that's when I explained that to him also.

THE COURT: Do you recall when you spoke with the attorney general?

MR. CARDINEL: I don't -- again, I don't know the date.

THE COURT: Okay.  And you explained to them that you were not in Corcoran in 2006.

MR. CARDINEL: I explained to everybody, the defendant, the attorney general, that I was not in Corcoran, nor did I have pertinent information, nor did I need to testify.

THE COURT: And you don't recall when that was.

MR. CARDINEL: I do not recall the dates, no.

### c.   Testimony of Jimmy Reed

MR. DOUGLAS: Mr. Reed, look in front of you.  For the record, it is Exhibit 4, page 21, ECF No. 91.  Is your signature on the bottom of that?

MR. REED: Yes.

MR. DOUGLAS: And did you understand that you were signing this under penalty of perjury?

MR. REED: Yes.

MR. DOUGLAS: Where were you when you signed this?  Do you remember?  Do you recall?

MR. REED: Yeah.  I was in yard up there in Kern Valley State Prison.

MR. DOUGLAS: And how did you come about to sign this document?

MR. REED: James asked if -- if I'll help him out, if I recall this -- the -- the time period in the Corcoran SHU when we were together there, and I said yeah and we talked about the particular LVN and we're going back through some of the stories that we both had problems with her and we knew that other people had problems with her too, and he asked me if I'd help him out here and I said yeah.  He told me I'd have to sign this -- this thing right here, and I told him all right.

MR. DOUGLAS: Did you tell him what to put in this declaration in front of you?

MR. REED: No.  He just -- he did the work and everything, but he asked me if -- if I would just run down -- down some past history and just a little bit of what I could testify to.

THE COURT: Did he tell you specifically what the incident was with which he had a problem with this person?

MR. REED: Yeah, for his? Yeah, the dental thing?

THE COURT: Yes.

MR. REED: Yeah.

THE COURT: And did he tell you when that happened?

MR. REED: Yeah.  I -- I remember some of it, but you have to understand, I was in the SHU for 11 years and stuff went together –

THE COURT: Okay.

MR. REED: -- you know, so –

THE COURT: Is it true that you have seen, heard, and observed Defendant Saenz refusing Mr. James' pleas for medical and dental attention over a period of 37 days?

MR. REED: It -- what she would do -- if -- say if we were out on the yard and she didn't feel like running around to all the cages, and giving us meds or something, then she would just bypass us, and if you yell hey, hey, what about me and, oh, I'll be back or you refused, and then she would just take off and not come back.

THE COURT: I'm not talking generally. I'm talking specifically regarding Mr. James' interaction with Ms. Saenz.

MR. REED: I can say that I couldn't say -- I would believe it more that that happened what I just told you than anything else because -- just because for, you know, almost ten years of dealing with this person that I -- I could say -- I could say pretty much that I could believe that that's true.

THE COURT: Did you ever see it happen with respect to Mr. James?

MR. REED: I don't know.  I -- I don't remember.  I just -- I just remember him telling me about the problems that he's having with her and I just thought, yeah, me too, you know.

THE COURT: So you had not seen, heard, and observed Defendant Saenz refusing Mr. James' pleas for medical and dental help.

MR. REED: He asked her to go up there a couple times. A bunch of times.

THE COURT: And you saw that?

MR. REED: Yeah. We were all have problems with her.

THE COURT: No, no. I'm not asking about what everybody did. I'm asking about --

MR. REED: I can't remember a specific day and a specific time or nothing like that.

THE COURT: Okay.

MR. REED: I can't.

THE COURT: So you don't really recall this 37-day period.

MR. REED: No.

MR. DOUGLAS: No further questions.

THE COURT: Mr. James, do you have any questions of this witness?

1    MR. JAMES: Yeah. I'd like to show him this document right here.

2    THE COURT: And which document are you referring to?

3    MR. JAMES: The yard schedule.

4    THE COURT: Is that your yard schedule?

5    MR. JAMES: No. This is the one out of the defendant's exhibits.

6    THE COURT: Which exhibit are you referring to?

7    MR. JAMES: EXG3.

8    THE COURT: Mr. Douglas, which exhibit is Mr. -- is it Exhibit 9?

9    MR. JAMES: Exhibit 9.

10   THE COURT: Okay. Thank you. And which page of Exhibit 9 would you like this
11   witness to refer to?

12   MR. JAMES: The yard schedule, EXG3, 4, 5, and 6.

13   THE COURT: If we can please put EXG3 on the overhead projector.

14   (Pause.)

15   THE COURT: Okay. What is your question regarding this document, Mr. James?

16   MR. JAMES: Do you recognize that document?

17   MR. REED: Yeah. It's the daily moving schedule.

18   MR. JAMES: Did you have a copy of this?

19   MR. REED: Yeah, I did.

20   MR. JAMES: Where'd you get it from?

21   MR. REED: You gave it to me.

22   MR. JAMES: All right. Thank you.

23                                          ***

24   THE COURT: Do you have any further questions, Mr. James?

25   MR. JAMES: No, I don't.

26   THE COURT: Okay. Any further questions of Mr. Reed, Mr. James?

27   MR. JAMES: No.  Well, one question.

28   MR. JAMES: Do you believe that you're actually a sight and earwitness to the abuse
     of Ms. Saenz to me?

1   MR. REED: Yes. I -- like I said, from -- from everything that I experienced
    throughout that time, I - - I can fully believe that what you're saying is true because
2   she did -- not just one person, but she did it to all of us.

3   MR. JAMES: Right.

4   MR. REED: It wasn't like her just picking on one single person.  It's just she passed
    out a couple meds and if she forgot you, then she forgot you.  That was it.  She
5   wasn't coming back.

6   MR. JAMES: All right. Thank you.

7   (Evid. Hrg. Tx., 129:21-135:21.)

8
        **B.      Findings**
9

10      For the reasons which follow, the Court finds that at the time Plaintiff filed his motion

11  seeking the attendance of incarcerated witnesses, he was aware of what an eye and/or ear witness was

12  and he knowingly represented to the Court that James Cardinel and Jimmy Reed were eye and ear

13  witnesses to relevant events which occurred during the thirty-seven day period at issue in this action.

14  The Court finds that the explanations provided by Plaintiff in response to the order to show cause

15  lack credibility, and the Court is not persuaded that (1) Plaintiff was unknowingly misled by

16  witnesses, who through their statements, convinced him they were eye and ear witnesses, and/or (2)

17  Plaintiff inadvertently made the misrepresentations because in drafting the declarations, he was

    merely copying from a form.
18

19      As an initial matter, Plaintiff's filings, his appearances at two telephonic hearings, and his

20  appearance and testimony at the evidentiary hearing establish that he reads and writes English

21  fluently, and he testified that he obtained his GED while in prison.  (Evid. Hrg. Tx., 52:19-20 &

22  53:11-16.)  While Plaintiff is proceeding pro se and the Court is mindful of that fact, this case does

23  not involve the existence of a language barrier, disability, or other impediment which might explain

    or excuse the conduct at issue.
24

25      To the contrary, Plaintiff's witness motion and his participation at the TTCH support the

26  finding that he was fully aware of his actions.  The second scheduling order informed Plaintiff in

27  clear, plain language what was required to obtain the attendance of incarcerated witnesses, and

28  within mere weeks after the issuance of the order, Plaintiff had prepared his own declarations and

                                            28

the declarations for Mr. Cardinel and Mr. Reed in compliance with the order, without any input from Mr. Cardinel and Mr. Reed.  Mr. Cardinel and Mr. Reed were longtime friends of Plaintiff's and at the time the second scheduling order was issued, they were all incarcerated together at Kern Valley State Prison.  While the three had previously served time together at CSP-Corcoran, their selection as witnesses shortly after the issuance of the order and at a time when Plaintiff had access to them is likely not purely coincidental.

The declarations themselves differ sufficiently to belie Plaintiff's claim that any misrepresentations were the unintentional result of copying from a form.  To the contrary, the differences between the declarations demonstrate that Plaintiff knowingly and intentionally set forth, for each witness, the facts he believed to be necessary to secure their attendance at trial.

Plaintiff's claim that he was educated for the first time on what an eye and ear witness meant by the Court either just before or during the TTCH and that as a result, he dismissed Mr. Bengar and Mr. David Reed is also unsupported by the record.  Any knowledge Plaintiff acquired from the Court prior to dismissing Bengar and Reed necessarily came from the second scheduling order, and the contents of the declarations are supportive of that finding.

When the TTCH commenced, the Court informed the parties that it found the declarations of Mr. Cardinel and Mr. Jimmy Reed to be sufficient, and it granted Plaintiff's motion for their attendance at trial.  *See supra* pp. 5-8.  The Court then asked Plaintiff what Mr. Bengar saw or heard, and Plaintiff immediately withdrew his motion as to Bengar, stating that he heard about the events from Plaintiff and was not there personally.  *Id.*  Plaintiff also withdrew his motion for the attendance of David Reed on the same ground.  *Id.*  These actions are inconsistent with Plaintiff's professed ignorance of what it meant to be an eye and ear witness and his actions did not follow any explanation by the Court which might have prompted them.  *Id.*

When, based on Defendant's position that the declarations were not sufficiently specific as to Mr. Cardinel and Mr. Jimmy Reed, the Court questioned Plaintiff, he clearly and unequivocally confirmed that during the thirty-seven day period at issue, both inmate witnesses saw and heard him ask Defendant for medical care, which she refused to provide.  *Id.*  Despite alleging in his complaint that Defendant refused him care while improperly assessing his condition through his perforated steel

cell door, Plaintiff explained in elaborate detail how the events occurred on the yard and how his

inmate witnesses were able to see and hear events from their yard cages. *Id.* At no time did Plaintiff

express any doubt or uncertainty over whether Mr. Cardinel and Mr. Reed were actually eye and ear

witnesses qualified to testify on his behalf, contrary to his later testimony that he had doubts but

wanted to meet with his witnesses before releasing them. *Id.*

More contradictions follow the period of time between the TTCH and the motions in limine

hearing. Plaintiff testified, variously, that based on his newfound doubt, which purportedly arose

either prior to or during the TTCH based on information he thought was provided by the Court: (1)

he met with his witnesses within days after the TTCH and showed them the documentation provided

by Defendant as evidence they could not have been eye or ear witnesses; (2) he met with his

witnesses shortly after the hearing but did not yet have the documentation to show them; (3) he met

with his witnesses a second time after receiving the motion in limine to show them the

documentation; and (4) he was unable to meet with his witnesses due to limited yard time.

Given that Defendant did not file her motion in limine until December 21, 2012, Plaintiff

did not receive the motion until December 27, 2012, and Mr. Reed's daily activity record was filed

under seal due to security concerns, it remains unexplained how Plaintiff could have shown Mr.

Reed his yard schedule at all, as Plaintiff maintained during the evidentiary hearing.

In any event, Plaintiff prepared and served his opposition to the motion in limine on

December 30, 2012. Absent from the opposition was any mention of the motion to exclude the

testimony of Mr. Cardinel and Mr. Reed. This omission is notable given that Defendant moved to

exclude twelve separately enumerated types or pieces of evidence, and in a clear, coherent six page

opposition, Plaintiff addressed nine of the twelve categories.[4] Plaintiff's failure to address the

motion to exclude Mr. Cardinel and Mr. Reed's testimony at a point in time where, under his version

of events, he knew that they did not qualify as witnesses defies any reasonable explanation. It is

simply not consistent with the good faith behavior Plaintiff seeks to attribute to himself.

---

[4] Also left unaddressed was the request to preclude Plaintiff and his inmate witnesses from testifying as to matters which require medical or dental expertise, an issue which is not subject to any reasonable dispute. Fed. R. Evid. 701, 702.

When Plaintiff was questioned during the motions in limine hearing regarding why he remained silent after purportedly discovering shortly after December 5, 2012, that Mr. Cardinel and Mr. Reed did not qualify as witnesses, Plaintiff stated he is not a lawyer, he did not know he needed to, and he planned to let the Court know at the hearing. This explanation rings hollow in the face of Plaintiff's written opposition to Defendant's motion to exclude other types or categories of evidence.

Turning to the evidentiary hearing, the testimony established that at no time did either Mr. Cardinel or Mr. Reed have firsthand knowledge of the events underlying Plaintiff's claim against Defendant. Mr. Cardinel and Mr. Reed had known Plaintiff for a long time, as they were all members of the same gang. Mr. Cardinel was aware generally, via correspondence with other individuals, that Plaintiff had medical issues, and they had talked about Plaintiff's case. Mr. Reed was aware generally of Plaintiff's medical issues and they both had problems with Defendant. However, none of the testimony supports Plaintiff's stated position that it was Mr. Cardinel and Mr. Reed who were responsible for providing him with statements sufficient to mislead him to believe, in error, that they eye and ear witnesses to the relevant events.

Indeed, following the filing of Defendant's motion in limine to exclude the testimony of Mr. Cardinel and Mr. Reed, no clear, plausible, good faith explanation ever emerged for what were proven to be misrepresentations regarding Mr. Cardinel and Mr. Reed's qualifications to testify. The Court was instead provided with unconvincing explanations and vague, sometimes contradictory testimony. Plaintiff's position at various junctures has shifted and positions he has taken in an effort to explain his purported lack of willful misconduct have either lacked support in the record or been directly contradicted by the record.

Plaintiff's position that he did not intentionally mislead the Court and that the inaccurate declarations were an innocent mistake arising from (1) his misunderstanding regarding the definition of an eye or ear witness, (2) statements his witnesses provided him in error and upon which he relied, and/or (3) his actions in copying from a form is not supported by the record; and the Court finds Plaintiff's written and oral testimony in response to the order to show cause to lack credibility. The Court finds that it was clear from the outset what was required to obtain the attendance of

incarcerated witnesses and Plaintiff understood what an eye and/or ear witness was, Plaintiff was not misled by Mr. Cardinel and Mr. Reed, and the misrepresentations were not attributable to drafting errors.

Therefore, the Court finds that Plaintiff misrepresented what Mr. Cardinel and Mr. Reed saw and/or heard and that he did so intentionally for the improper purpose of securing their otherwise impermissible attendance at trial to testify in his favor.  That such conduct amounts to bad faith is unquestionable.  Engaging in the falsification of declarations to secure the presence of otherwise unqualified witnesses at trial undermines the integrity of judicial proceedings and is utterly inconsistent with the orderly administration of justice.  *Leon*, 464 F.3d at 958 (citing *Anheuser-Busch, Inc.*, 69 F.3d at 348) (quotation marks omitted).

**C.    Assessment of Sanctions**

Having found that Plaintiff acted in bad faith by misrepresenting what his witnesses saw and heard in order to secure their attendance at trial, the Court must determine the appropriate sanction, which requires the Court to weigh "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 460 F.3d 1217, 1226 (9th Cir. 2006) (internal quotations and citations omitted).  These factors guide a court in deciding what to do and are not conditions that must be met in order for a court to take action.  *In re PPA*, 460 F.3d at 1226 (citation omitted).

**1.    Interest in Expeditious Resolution and Need to Manage Docket**

The public's interest in expeditious resolution of litigation always favors dismissal, as does the Court's need to effectively manage its docket. *Pagtalunan v. Galaza*, 291 F.3d 639, 642 (9th Cir. 2002) (citing *Yourish v. California Amplifier*, 191 F.3d 983, 990 (9th Cir. 1999)) (quotation marks omitted); *Leon*, 464 F.3d at 960.

**2.    Risk of Prejudice**

Turning to the risk of prejudice, "pendency of a lawsuit is not sufficiently prejudicial in and of itself to warrant dismissal." *Pagtalunan*, 291 F.3d at 642 (citing *Yourish*, 191 F.3d at 991).

Rather, the inquiry looks to whether the wrongful actions impaired the opposing party's ability to go to trial or threatened to interfere with the rightful decision of the case. *Leon*, 464 F.3d at 959 (citing *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988)) (quotation marks omitted). Because the fabrications came to light prior to trial, the content of the witnesses' testimony at trial cannot be known. However, their proposed testimony was that, during the thirty-seven day period at issue in this action, they saw and heard Defendant refuse to obtain medical care for Plaintiff despite his stated need for care. Plaintiff's demonstrated willingness to suborn perjured testimony in an attempt to gain an advantage at trial unquestionably threatens to interfere with the rightful decision of the case and therefore, the third factor weighs in favor of dismissal.

### 3.   Disposition on Merits

Because public policy favors disposition on the merits, this factor always weighs against dismissal. *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011); *Leon*, 464 F.3d at 959; *Pagtalunan*, 291 F.3d at 643. However, this factor, standing alone, does not outweigh the other factors. *Leon*, 464 F.3d at 959.

### 4.   Availability of Lesser Sanctions

Finally, as for the availability of lesser sanctions, at this stage in the proceedings there is little available to the Court which would constitute a satisfactory lesser sanction given the magnitude of the misconduct. A verbal reprimand is not sufficient. Misrepresenting what witnesses saw and heard to secure their attendance at trial is not a minor violation for which mere censure is appropriate.

Plaintiff is indigent and proceeding in forma pauperis and as a result, the imposition of monetary sanctions would likely be futile and unenforceable. *See Thomas v. Gerber Prod.*, 703 F.3d 353, 357 (9th Cir. 1983) (it is an abuse of discretion to select a sanction which cannot be performed).

While the Court could preclude Plaintiff's witnesses, Plaintiff already withdrew his request for their appearance and the determination that Mr. Cardinel and Mr. Reed did not witness the events at issue compelled their preclusion. A result which is necessitated by misconduct should not be conflated with the sanction imposed for committing the misconduct.

Finally, the preclusion of trial exhibits would still allow Plaintiff a trial by jury while taxing the scarce resources of the State of California and the United States District Court for the Eastern District of California. Given the conduct at issue, merely precluding exhibits but permitting the trial to proceed is inappropriate. Truth is the most critical factor in determining whether to assess case-dispositive sanctions, *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d at 1091, 1097 (9th Cir. 2007), and here, Plaintiff sacrificed the truth in an effort to gain advantage at trial. Allowing the trial to proceed notwithstanding conduct which is antithetical to the pursuit of the truth does not suffice to sanction the conduct.

Accordingly, based on the foregoing, the Court finds that terminating sanctions are warranted in this instance.

**IV.    Order**

For the reasons set forth herein, the Court HEREBY ORDERS as follows:

1.    This action is dismissed, with prejudice, as a sanction against Plaintiff for acting in bad faith by misrepresenting that inmate witnesses James Cardinel and Jimmy Reed were ear and eye witnesses to relevant events;

2.    The Clerk of the Court shall enter judgment in favor of Defendant; and

3.    Defendant's pending motion is limine is denied as moot in light of this order.

IT IS SO ORDERED.

**Dated:    July 9, 2013**                            **/s/ Sheila K. Oberto**
                                              UNITED STATES MAGISTRATE JUDGE